76 P.3d 589

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Bryan MARA, also known as Bryon Mara, Defendant–Appellant.**

**No. 24703.**

Intermediate Court of Appeals of Hawai'i.

Aug. 13, 2003.

Certiorari Denied Sept. 19, 2003.

Stuart N. Fujioka, (Nishioka & Fujioka), Honolulu, on the briefs, for Defendant–Appellant.

Bryan K. Sano, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for Plaintiff–Appellee.

BURNS, C.J., WATANABE and FOLEY, JJ.

Opinion of the Court by BURNS, C.J.

Following a jury trial, Defendant–Appellant Bryan Mara, also known as Bryon Mara (Mara), appeals from the November 14, 2001 Judgment, Guilty Conviction and Sentence (November 14, 2001 Judgment), entered by Judge Karen S.S. Ahn, convicting him of Count I, Burglary in the First Degree, Hawai'i Revised Statutes (HRS) § 708–810(1)(c) (1993)[1]; Count II, Robbery in the Second Degree, HRS § 708–841(1)(b) (1993)[2]; and Count III, Kidnapping, HRS § 707–720(1)(e) (1993)[3].

On appeal, Mara asserts that (1) plain error occurred when the court mis-worded its special interrogatory on the question of whether Mara voluntarily released complaining witness, Sandralyn Nguyen (Nguyen); (2) there was insufficient evidence to support a finding that Mara did not release Nguyen voluntarily; (3) the court erred when, by sentencing Mara for Counts I and II to extended terms of imprisonment to be served "consecutively with any other sentence currently being served" by Mara, the November 14, 2001 Judgment imposed a sentence more severe than the sentence imposed by the November 29, 2000 Judgment; and (4) the court erred when it "either [rejected] or [failed] to consider 'strong mitigating circumstances' which would reduce [Mara's] mandatory term of imprisonment as set forth in" HRS § 706–606.5 (Supp.2002). We agree with assertion (3) and disagree with assertions (1), (2), and (4).

---

1. Hawai'i Revised Statutes (HRS) § 708–810(1) (1993) states, in relevant part, as follows:

 A person commits the offense of burglary in the first degree if the person intentionally enters or remains unlawfully in a building, with intent to commit therein a crime against a person or against property rights, and:

 ....

 (c) The person recklessly disregards a risk that the building is the dwelling of another, and the building is such a dwelling.

2. HRS § 708–841(1)(b) (1993) states, in relevant part, as follows: "A person commits the offense of robbery in the second degree if, in the course of committing theft: ... [the] person threatens the imminent use of force against the person of anyone who is present with intent to compel acquiescence to the taking of or escaping with the property[.]"

3. HRS § 707–720 (1993) states, in relevant part, as follows:

 (1) A person commits the offense of kidnapping if the person intentionally or knowingly restrains another person with intent to:

 ....

 (e) Terrorize that person or a third person; ....

 ....

 (2) Except as provided in subsection (3), kidnapping is a class A felony.

 (3) In a prosecution for kidnapping, it is a defense which reduces the offense to a class B felony that the defendant voluntarily released the victim, alive and not suffering from serious or substantial bodily injury, in a safe place prior to trial.

## BACKGROUND

On September 22, 1998, in Cr. No. 98–2052, Mara was indicted. On September 12, 2000, Mara pleaded guilty to the three counts charged in the September 22, 1998 indictment. Judge Richard K. Perkins set sentencing for November 8, 2000. There was no plea bargain.

On November 6, 2000, Plaintiff–Appellee State of Hawai'i (the State) filed three motions pertaining to Mara's sentence. In its Motion for Extended Term of Imprisonment (Motion for Extended Term Sentencing), the State asked the court, pursuant to HRS §§ 706–661, 706–662(1), and 706–662(4)(a) (Supp.2002), to sentence Mara to "an extended term of life imprisonment as to Count III, and twenty (20) years imprisonment as to Counts I and II." In its Motion for Consecutive Term Sentencing (Motion for Consecutive Sentencing), the State asked the court, pursuant to HRS §§ 706–668.5 and 706–606 (1993), to sentence Mara to "consecutive terms of imprisonment." In its Motion for Sentencing of Repeat Offender (Motion for Repeat Offender Sentencing), the State asked the court, pursuant to HRS § 706–606.5 (Supp.2002), to sentence Mara to "a mandatory minimum [term] of twenty (20) years of imprisonment in Count III, and ten (10) years of imprisonment as to Counts I and II."

Following a hearing on November 29, 2000, at which the court considered a presentence report, the court orally granted the State's Motion for Repeat Offender Sentencing, but denied its Motions for Extended Term Sentencing and Consecutive Sentencing.

On November 29, 2000, the court entered a Judgment, Guilty Conviction and Sentence (November 29, 2000 Judgment) against Mara. In the November 29, 2000 Judgment, the court sentenced Mara to ten years' incarceration on Counts I and II and twenty years' incarceration on Count III. The court set the mandatory minimum term of imprisonment at ten years on Counts I and II and twenty years on Count III. The court ordered all sentences to run "concurrently with each other and with any other sentence [Mara] is now serving." The Mittimus, War-rant of Commitment to Jail, was "to issue immediately."

On March 1, 2001, Mara filed a "Motion for Correction of Sentence Under [Hawai'i Rules of Penal Procedure (HRPP)] Rule 35, or in the Alternative, Motion to Withdraw Guilty Plea." In a declaration attached to the motion, Mara's attorney asserted, among other things, that Mara believed he was not properly advised about the consequences of his repeat offender status. Following a hearing on May 2, 2001, Judge Perkins, on May 9, 2001, issued a "Finding of Fact, Conclusion of Law and Order Granting Defendant's Motion for Correction of Sentence Under *HRPP* Rule 35, or in the Alternative, Motion to Withdraw Guilty Pleas Filed March 1, 2001" that stated, in relevant part, as follows:

### FINDING OF FACT

1. [Mara] was not advised by the Court of the consequences of repeat offender sentencing at the time he entered his guilty pleas herein.

Based upon the above Finding of Fact, the Court makes the following Conclusion of Law:

### CONCLUSION OF LAW

1. Because [Mara] was not advised by the Court of the consequences of repeat offender sentencing at the time he entered his guilty pleas herein, those pleas are not valid. *Conner v. State*, 9 Haw.App. 122, 826 P.2d 440 (1992).

. . . .

Based upon the foregoing Finding of Fact and Conclusion of Law,

IT IS HEREBY ORDERED that [Mara's] Motion for Correction of Sentence Under *HRPP* Rule 35, or in the Alternative, Motion to Withdraw Guilty Pleas Filed March 1, 2001, be and hereby is GRANTED.

On August 27, 2001, Mara's trial began in the courtroom of Judge Ahn. At trial, the following evidence was adduced.

On July 6, 1998, after picking up her four-year-old daughter from the babysitter, Ngu-

yen returned home to her two-floor, two-bedroom townhouse located at 98–268 Ualo Street. When Nguyen got home, she placed her daughter on a couch on the first floor because her daughter was sleeping. After she "shut everything" and "locked everything" up downstairs, Nguyen went to the master bedroom on the second floor to use her computer and call the cable company. Nguyen testified that it was her normal practice to secure the townhouse because "it's just me and my daughter."

As Nguyen waited for a cable company representative to answer the telephone, Mara came into the master bedroom. Nguyen stated that she did not know Mara and had not invited Mara into the townhouse. Nguyen mentioned that she was scared because she did not know Mara.

Upon entering the bedroom, Mara grabbed the telephone from Nguyen's hand and asked with whom was she speaking. When Nguyen responded, "Nobody," Mara put the telephone to his ear and then hung it up.

Nguyen asked Mara, "Where's my baby? Where's my daughter?" Putting his hand beneath his untucked white shirt, Mara told Nguyen "to be quiet because he [had] a gun and he [did not] want to kill [her]."

Wanting to escape from Mara to get her daughter who was downstairs, Nguyen "kept arguing or fighting against [Mara]" by repeating, "I want to see my daughter," and acting like she was going downstairs. Mara responded by "pushing [Nguyen] down to the bed" and throwing the bed's comforter over her head. When Nguyen attempted to get up, Mara grabbed her left arm and pushed her down to the carpeted floor.

At the time, Mara and Nguyen were facing an entertainment center located against the wall of the bedroom. Mara placed Nguyen's head between his legs so that she would not be able to move. When Mara had Nguyen restrained, Mara "started grabbing whatever he [could] from [the bedroom's] entertainment center."

After he took a number of valuables from the bedroom entertainment center, Mara turned his attention to an open closet located a short distance away. When Mara moved away from Nguyen and checked the closet for "any hidden money or jewelries [sic]," Nguyen "ran downstairs to check for [her] daughter."

When Nguyen left the bedroom, Mara followed her. Nguyen reached the front door of the townhouse and tried to open the door, but "for some reason it got stuck." Before Nguyen could make another attempt to open the front door, Mara pulled Nguyen's hair and pushed her to the floor. When Nguyen fell to the floor, Mara went back upstairs to retrieve the items he had taken from Nguyen. Using Mara's absence as an opportunity to escape, Nguyen grabbed her daughter, opened the front door, and ran to a neighbor's house yelling for help. Nguyen saw Mara leave the townhouse a short time later.

When cross-examined about the incident by Mara's attorney, Nguyen testified, in relevant part, as follows:

[Mara's Attorney:] So when you were downstairs trying to get away, [Mara] ran back upstairs to get the jewelry; is that correct?

[Nguyen:] Yes.

Q: Okay. But prior to that, he had . . . you within his grasp?

A: No.

Q: He never had you within his grasp?

A: No.

Q: He just had his hand on your arm?

. . . .

A: He just grabbed my arm when I'm trying to walk away to go run down from the stairs. That's how he grabbed my arm. But he wasn't holding me or something. He just grabbed my arm to push me in.

Q: And how long had he grabbed your arm?

A: Sorry. I don't know.

Q: And then did you push him away or did he let go of your arm?

A: No, I didn't push him away.

Q: Okay. So he let go then?

A: Yes.

Mara did not testify in his own defense.

One of the jury instructions submitted by Mara was the following:

### [MARA'S] PROPOSED JURY INSTRUCTION NO. 5

If your verdict in Count III is Guilty As Charged of the offense of Kidnapping, then you must answer the following questions:

1. Has the prosecution proven beyond a reasonable doubt that Defendant Bryan Mara did not voluntarily release Sandralyn Nguyen in a safe place prior to trial?

. . . .

2. Has the prosecution proven beyond a reasonable doubt that Defendant Bryan Mara did not release Sandralyn Nguyen alive and not suffering from serious or substantial bodily injury?

. . . .

You must answer each of these questions separately. A "Yes" answer to both of these questions must be unanimous. If you are not unanimous in your answer to either of these questions, you must answer that question "No".

HRS § 707–720(3); *State v. Molitini [Molitoni]*, 6 Haw.App. 77 [711 P.2d 1303] (1985) .

On August 29, 2001, pursuant to the agreement of the parties, the court instructed the jury, in relevant part, as follows:

In Count III of the Indictment, the Defendant, Bryan Mara, is charged with the offense of Kidnapping.

A person commits the offense of Kidnapping. if he intentionally or knowingly restrains a person with intent to terrorize that person.

There are three material elements of the offense of Kidnapping, each of which the prosecution must prove beyond a reasonable doubt.

These three elements are:

1. That, on or about July 6, 1998, in the City and County of Honolulu, State of Hawai'i, the Defendant, Bryan Mara, restrained Sandralyn Nguyen; . . .

2. That the Defendant did so intentionally or knowingly; and

3. That the Defendant did so with the intent to terrorize that person.

. . . .

If you find that the prosecution has proven beyond a reasonable doubt that the Defendant committed the offense of Kidnapping, then you must also answer the following questions on a special interrogatory which will be provided to you:

1. Has the prosecution proven beyond a reasonable doubt that the Defendant, Bryan Mara, did not release Sandralyn Nguyen voluntarily?

2. Has the prosecution proven beyond a reasonable doubt that the Defendant, Bryan Mara, did not release Sandralyn Nguyen alive and not suffering from serious or substantial bodily injury?

3. Has the prosecution proven beyond a reasonable doubt that the Defendant, Bryan Mara, did not release Sandralyn Nguyen in a safe place prior to trial?

You must answer each of these questions separately. A "Yes" answer to any of these questions must be unanimous. If you are not unanimous in your answer to any of these questions, then you must answer that question "No".

In answering the three special interrogatory questions, the jury answered "Yes" to question no. 1 and "No" to each of questions nos. 2 and 3.[4] On August 29, 2001, the jury found Mara guilty of all counts charged in the September 22, 1998 Indictment. The court set sentencing for November 1, 2001.

On October 1, 2001, the State filed a Motion for Extended Term of Imprisonment, a Motion for Consecutive Term Sentencing, and a Motion for Sentencing of Repeat Offender. On October 3, 2001, Mara filed "De-

4. It appears that, when the jury answered question no. 1 in the affirmative, the jury found that Plaintiff–Appellee State of Hawai'i (the State) proved beyond a reasonable doubt that Defendant–Appellant Bryan Mara did not "release" the victim. On the contrary, the State proved that the victim escaped. There having been no "release," the jury answered questions nos. 2 and 3 in the negative.

fendant's Memorandum in Opposition to State's Motion for Extended Term of Imprisonment and Motion for Consecutive Term Sentencing Filed October 1, 2001." In his memorandum, Mara argued that an extended and consecutive term of imprisonment were not authorized in his case because HRS § 706–609 (1993) precluded such sentencing options.

On November 13, 2001, following a hearing on November 1, 2001, the court orally granted the State's Motion for Sentencing of Repeat Offender, granted in part and denied in part the State's Motion for Extended Term of Imprisonment, and denied the State's motion for the imposition of consecutive rather than concurrent terms. In relevant part, the court stated as follows:

Mr. Mara, you know, I really have thought a lot about this. I don't think it's all that easy, because the motion for repeat offender, I have to grant, okay. And I am going to grant that motion.

The motion for extended [term of imprisonment], it's a close call. I mean, I think your record shows that the violence has been escalating, and . . . I think it's right for the Court to consider what happened during trial and your record, of course.

And I think that looking at everything, I really feel that I should grant the motion for extended [term of imprisonment], at least in this set of cases [ (Cr. No. 98–2052) ]. . . .

And, you know, with . . . extending the tens to . . . twenties . . ., that's all with possibility of parole, considering your age, I have no problem.

The one that really made me think was the kidnapping. It's not that easy to extend someone's term from 20 years to life. I even considered, maybe not granting as to that [motion] which would be a little bit of an aberration, but it's because, I mean, you know, it's a close call, but I don't know.

. . . .

All right. . . . I am going to grant [the Motion for Repeat Offender Sentencing and Motion for Extended Term Sentencing], with respect to Counts 1 and 2.

As to Count 3, I'm going to grant the [Motion for Repeat Offender Sentencing] so that the sentence is[,] as in Counts 1 and 2, you will serve a term of 20 years with a mandatory term of ten. In Count 2, you will pay restitution of $800.

In Count 3, you will serve a sentence of 20 years with a mandatory minimum of 20 years, all concurrent[.]

. . . .

I believe this man is dangerous to the community, and these extended terms are required to protect the community.

. . . .

I have considered the factors under [HRS § ] 706–606 very seriously.

On November 14, 2001, the court amended its decision, in relevant part, as follows:

Yesterday I misspoke to the motion for consecutive [sentencing]. I am going to order that the jail terms run consecutively to what Mr. Mara is doing now. . . . I think that's fair for the following reasons:

I take judicial notice of the trial proceedings and the files herein.

I've looked at, of course, the [HRS § ] 706–606 factors, and I think that [Mara] . . . has an escalating violence problem.

He's a danger to the community, . . . and I think the consecutive [sentence] is necessary to protect the public. In addition, it is just punishment.

You know, I'm the new judge. I am not the [judge] who handled the withdrawal of the . . . guilty plea, and hence, a judge without any interest in what happened with regard to that proceeding.

I heard the trial on the merits and am familiar with the trial circumstances and, of course, I've reviewed the presentence report very carefully.

I think that this is an appropriate sentence, considering [Mara's] dangerousness to society and is . . . necessary. . . .

So the motion for consecutive [sentencing] as to what Mr. Mara is doing now is granted[.]

The court imposed twenty years' incarceration for each of Counts I, II, and III, a

mandatory minimum of twenty years for Count III, and a mandatory minimum of ten years for Counts I and II.

We note that the court only partially granted the State's Motion for Consecutive Sentencing. In its motion, the State asked that the imprisonment term imposed for each count run consecutive to any other term of imprisonment Mara was serving. In other words, the State wanted the imprisonment term for each count to run consecutive to the terms for each of the other counts and to any other term Mara was serving. However, on November 14, 2001, the court stated its "order that the jail terms run consecutively to what Mr. Mara is doing now[.]" In other words, although it ordered the three imprisonment terms to run consecutive to any other term Mara was serving, the court ordered the three imprisonment terms to run concurrent with each other. Thus, the November 14, 2001 Judgment states, "SENTENCE TO BE SERVED CONSECUTIVELY WITH ANY OTHER SENTENCE CURRENTLY BEING SERVED AND WITH CREDIT TO BE GIVEN FOR TIME ALREADY SERVED." The "SENTENCE" refers to the sentence for Counts I, II, and III. The November 14, 2001 Judgment does not say that the sentences for each of the three counts run consecutive to each other.

The November 14, 2001 Judgment also ordered payment of $800 restitution for Count II and ordered the mittimus to issue immediately. Mara's Notice of Appeal followed on November 20, 2001.

## STANDARDS OF REVIEW

### Jury Instructions To Which No Objection Was Made

As a general rule, jury instructions to which no objection has been made at trial will be reviewed only for plain error. This court will apply the plain error standard of review to correct errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights.

This court's power to deal with plain error is one to be exercised sparingly and with caution because the plain error rule represents a departure from a presupposition of the adversary system—that a party must look to his or her counsel for protection and bear the cost of counsel's mistakes.

If the substantial rights of the defendant have been affected adversely, the error will be deemed plain error.

When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading . . . .

. . . The trial court is not required to instruct the jury in the exact words of the applicable statute but to present the jury with an understandable instruction that aids the jury in applying that law to the facts of the case. Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial. If that standard is met, however, the fact that a particular instruction or isolated paragraph may be objectionable, as inaccurate or misleading, will not constitute ground for reversal. Whether a jury instruction accurately sets forth the relevant law is a question that this court reviews de novo.

Furthermore,

error is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error may have contributed to conviction.

If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside.

*State v. Vanstory,* 91 Hawai'i 33, 42–43, 979 P.2d 1059, 1068–69 (1999) (internal quotation marks, citations, and brackets omitted).

### Sufficiency of the Evidence

The Hawai'i Supreme Court has repeatedly stated:

[Evidence] adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.

" 'Substantial evidence' as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion."

*State v. Richie,* 88 Hawai'i 19, 33, 960 P.2d 1227, 1241 (1998) (citations and block quotation format omitted).

### Sentencing

"The authority of a trial court to select and determine the severity of a penalty is normally undisturbed on review in the absence of an apparent abuse of discretion or unless applicable statutory or constitutional commands have not been observed." *Barnett v. State,* 91 Hawai'i 20, 26, 979 P.2d 1046, 1052 (1999) (citations and internal quotation marks omitted). "In general, to constitute an abuse [of discretion] it must appear that the court clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *State v. Tauiliili,* 96 Hawai'i 195, 198, 29 P.3d 914, 917 (2001) (citations and internal quotation marks omitted).

### Statutory Interpretation

" '[The] interpretation of a statute . . . is a question of law reviewable *de novo.* ' " *State v. Kotis,* 91 Hawai'i 319, 327, 984 P.2d 78, 86 (1999) (citations omitted).

The Hawai'i Supreme Court has repeatedly stated that when interpreting a statute, an appellate court's

foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And where the language of the statute is plain and unambiguous, [a court's] only duty is to give effect to the [the statute's] plain and obvious meaning.

*State v. Wells,* 78 Hawai'i 373, 376, 894 P.2d 70, 73 (1995) (citations, brackets, and internal quotation marks omitted). Accordingly,

we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.

In construing an ambiguous statute, the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool. This court may also consider the reason and spirit of the law, and the cause which induced the legislature to enact it to discover its true meaning. Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another.

*State v. Rauch,* 94 Hawai'i 315, 322, 13 P.3d 324, 331 (2000) (citations, brackets, ellipses, internal quotation marks, and block quote format omitted).

### RELEVANT STATUTES

HRS § 706–606 states as follows:

The court, in determining the particular sentence to be imposed, shall consider:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant;

(2) The need for the sentence imposed:

 (a) To reflect the seriousness of the offense, to promote respect for law, and to provide just punishment for the offense;

 (b) To afford adequate deterrence to criminal conduct;

 (c) To protect the public from further crimes of the defendant; and

 (d) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) The kinds of sentences available; and

(4) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

HRS § 706–606.5 states, in relevant part, as follows:

(1) Notwithstanding [HRS] section 706–669 [5] and any other law to the contrary, any person convicted of . . . any class A felony [or] any class B felony . . . shall be sentenced to a mandatory minimum period of imprisonment without possibility of parole during such period as follows:

 . . . .

 (c) Three or more prior felony convictions:

 . . . .

 (ii) Where the instant conviction is for a class A felony—20 years;

 (iii) Where the instant conviction is for a class B felony—ten years;

 . . . .

(5) The sentencing court may impose the above sentences consecutive to any sentence imposed on the defendant for a prior conviction, but such sentence shall be imposed concurrent to the sentence imposed for the instant conviction. The court may impose a lesser mandatory minimum period of imprisonment without possibility of parole than that mandated by this section where the court finds that strong mitigating circumstances warrant such action. Strong mitigating circumstances shall include, but will not be limited to[,] the provisions of [HRS] section 706–621. The court shall provide a written opinion stating its reasons for imposing the lesser sentence.

(Footnote added.)

HRS § 706–609 states, in relevant part, as follows: "When a . . . sentence is set aside on direct or collateral attack, the court shall not impose a new sentence for the same offense, . . . which is more severe than the prior sentence."

HRS § 706–661 (Supp.2002) states, in relevant part, as follows:

In the cases designated in [HRS] section 706–662, a person who has been convicted of a felony may be sentenced to an extended indeterminate term of imprisonment. When ordering such a sentence, the court shall impose the maximum length of imprisonment . . . as follows:

 . . . .

 (2) For a class A felony—indeterminate life term of imprisonment;

 (3) For a class B felony—indeterminate twenty-year term of imprisonment;

 . . .

 . . . .

The minimum length of imprisonment for . . . (2) [and] (3) . . . shall be determined by the Hawaiʻi paroling authority in accordance with [HRS] section 706–669.

HRS § 706–662 (Supp.2002) states, in relevant part, as follows:

A convicted defendant may be subject to an extended term of imprisonment under [HRS] section 706–661, if the convicted defendant satisfies one or more of the following criteria:

 (1) The defendant is a persistent offender whose imprisonment for an extended term is necessary for protection of the public. The court shall not make this finding unless the defendant has previously been convicted of two felonies committed at dif-

---

**5.** HRS § 706–669 (1993 & Supp.2002) governs procedures for determining a minimum term of imprisonment.

ferent times when the defendant was eighteen years of age or older.

. . . .

(4) The defendant is a multiple offender whose criminal actions were so extensive that a sentence of imprisonment for an extended term is necessary for protection of the public. The court shall not make this finding unless:

. (a) The defendant is being sentenced for two or more felonies or is already under sentence of imprisonment for felony[.]

HRS § 706–668.5 states as follows:

(1) If multiple terms of imprisonment are imposed on a defendant at the same time, or if a term of imprisonment is imposed on a defendant who is already subject to an unexpired term of imprisonment, the terms may run concurrently or consecutively. Multiple terms of imprisonment imposed at the same time run concurrently unless the court orders or the statute mandates that the terms run consecutively. Multiple terms of imprisonment imposed at different times run consecutively unless the court orders that the terms run concurrently.

(2) The court, in determining whether the terms imposed are to be ordered to run concurrently or consecutively, shall consider the factors set forth in [HRS] section 706–606.

HRS § 707–720 states, in relevant part, as follows:

(1) A person commits the offense of kidnapping if the person intentionally or knowingly restrains another person with intent to:

. . . .

(e) Terrorize that person. . . .

. . . .

(2) Except as provided in subsection (3), kidnapping is a class A felony.

(3) In a prosecution for kidnapping, it is a defense which reduces the offense to a class B felony that the defendant voluntarily released the victim, alive and not suffering from serious or substantial bodily injury, in a safe place prior to trial.

## DISCUSSION

### 1.

■ In light of HRS § 707–720(3), which reduces the offense of Kidnapping from a class A felony to a class B felony if "the defendant voluntarily released the victim, alive and not suffering from serious or substantial bodily injury, in a safe place prior to trial[,]" Mara contends that the circuit court reversibly erred when it failed to include the phrase "prior to trial" in question no. 1 of the court's special interrogatory.

At the outset, we note that (a) Mara never objected to question no. 1 at trial and (b) question no. 1, excluding the names, repeats verbatim Hawai'i Pattern Jury Instructions—Criminal 9.37 (2002).[6] As noted

---

**6.** Hawai'i Pattern Jury Instructions—Criminal 9.37 (2002) and Judge Karen S.S. Ahn's instructions to the jury state as follows:

| Hawai'i Pattern Jury Instructions—Criminal 9.37 | Judge Ahn's Instruction to the Jury |
|---|---|
| If you find that the prosecution has proven beyond a reasonable doubt that the Defendant commit-committed the offense of Kidnapping, then you must also answer the following three questions on a special interrogatory which will be provided to you: | If you find that the prosecution has proven beyond a reasonable doubt that the Defendant committed the offense of Kidnapping, then you must also answer the following questions on a special interrogatory which will be provided to you: |
| 1. Has the prosecution proven beyond a reasonable doubt that the Defendant did not release (name of person) voluntarily? | 1. Has the prosecution proven beyond a reasonable doubt that the Defendant, Bryan Mara, did not release Sandralyn Nguyen voluntarily? |
| 2. Has the prosecution proven beyond a reasonable doubt that the Defendant did not release (name of person) alive and not suffering from serious or substantial bodily injury? | 2. Has the prosecution proven beyond a reasonable doubt that the Defendant, Bryan Mara, did not release Sandralyn Nguyen alive and not suffering from serious or substantial bodily injury? |

above, "[as] a general rule, jury instructions to which no objection has been made at trial will be reviewed only for plain error." *Vanstory*, 91 Hawai'i at 42, 979 P.2d at 1068.

The court asked the jury whether the State had proven beyond a reasonable doubt that Mara (1) did not release Nguyen voluntarily; (2) did not release Nguyen alive and not suffering from serious or substantial bodily injury; and (3) did not release Nguyen in a safe place prior to trial. Mara notes that "[the] time element ... applies to all of: voluntary release; no injury; and safe place. The court attached it only to item [3], safe place."

We conclude that the HRS § 707–720 defense imposed upon the State the burden of proving beyond a reasonable doubt that Mara did not (a) release Nguyen alive, (b) prior to trial, (c) voluntarily, (d) not suffering from serious or substantial bodily injury, or (e) in a safe place. If and when the State satisfied its burden of disproving one or more of these five elements, it disproved the defense.

According to the instruction actually given, it was the State's burden to prove beyond a reasonable doubt that Mara did not release Nguyen (a) voluntarily, (b) alive and not suffering from serious or substantial bodily injury, or (c) in a safe place prior to trial.

The failure of the instruction to connect "release" and "prior to trial" is harmless beyond a reasonable doubt. It is undisputed that Mara did not release the victim after the commencement of the trial. Moreover, when the court failed to limit the time of the release to a time prior to trial, it added to the State's burden. The jury found that the State had proven beyond a reasonable doubt that Mara did not, prior to the jury's verdict, voluntarily release the victim.

2.

 Mara contends that the State presented insufficient evidence to prove beyond a reasonable doubt that Mara did not release Nguyen voluntarily.

At trial, the State adduced evidence that upstairs, for a period of time, Mara physically prevented Nguyen from going downstairs. When Mara moved away from Nguyen and Nguyen ran downstairs to exit the door, Mara followed her, pulled her hair, and pushed her down to the floor. When Mara then went back upstairs to take possession of the items he was taking from Nguyen's bedroom, Nguyen ran from the house with her daughter. A short time later, Mara exited the townhouse and departed in his pickup truck.

Mara's attorney argued that Mara voluntarily released Nguyen when he (a) went to retrieve the stolen items from Nguyen's bedroom and (b) left 98–268 Ualo Street in his pickup truck. In this appeal, the question is whether the evidence at trial is sufficient to support findings, beyond a reasonable doubt, that Mara did not release Nguyen voluntarily. The following are the possibilities: (a) did not release, (b) released involuntarily, or (c) released voluntarily. We conclude that the evidence is sufficient to support a finding, beyond a reasonable doubt, that Mara "(a) did not release" Nguyen. The fact that Mara did not pursue Nguyen after she escaped is not evidence of a release.

3. Has the prosecution proven beyond a reasonable doubt that the Defendant did not release (name of person) in a safe place prior to trial?

You must answer each of these questions separately. A "Yes" answer to any of these questions must be unanimous. If you are not unanimous in your answer to any of these questions, then you must answer that question "No".

3. Has the prosecution proven beyond a reasonable doubt that the Defendant, Bryan Mara, did not release Sandralyn Nguyen in a safe place prior to trial?

You must answer each of these questions separately. A "Yes" answer to any of these questions must be unanimous. If you are not unanimous in your answer to any of questions, then you must answer that question "No".

We recommend a review of Hawai'i Pattern Jury Instructions—Criminal 9.37 (2002) in light of this opinion.

Moreover, even assuming it is concluded that the fact that Nguyen fell to the floor and Mara went back upstairs to retrieve the items he had taken from Nguyen prove all of the other elements of the defense, the State proved the "not in a safe place prior to trial" element. As long as Mara was in Nguyen's townhouse, it was not a safe place for Nguyen.

### 3.

In the November 29, 2000 Judgment and the November 14, 2001 Judgment, the court sentenced Mara as follows:

| | November 29, 2000 Judgment | November 14, 2001 Judgment |
|---|---|---|
| Count 1 | 10 years' incarceration and mandatory minimum | 20 years' incarceration and 10 years' mandatory minimum |
| Count 2 | 10 years' incarceration and mandatory minimum | 20 years' incarceration, 10 years' mandatory minimum, and $800 restitution |
| Count 3 | 20 years' incarceration and mandatory minimum | 20 years' incarceration and mandatory minimum |
| | These three sentences to run concurrently with each other and with any other sentence Mara is currently serving | These three sentences to run consecutive to any other sentence Mara is currently serving |
| | Mittimus to issue immediately | Mittimus to issue immediately |

Comparing the two sentences, it is apparent that the November 14, 2001 (second) sentence is more severe than the November 29, 2000 (first) sentence. Mara contends that the circuit court erred when the November 14, 2001 Judgment imposed a sentence more severe than the November 29, 2000 Judgment. Mara argues that HRS § 706–609 precludes such a sentence.

This subject matter has a long history. The United States Supreme Court in *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), decided two cases. In the first case, *Pearce*,

> the respondent Pearce was convicted in a North Carolina court upon a charge of assault with intent to commit rape. The trial judge sentenced him to prison for a term of 12 to 15 years. Several years later he initiated a state post-conviction proceeding which culminated in the reversal of his conviction by the Supreme Court of North Carolina, upon the ground that an involuntary confession had unconstitutionally been admitted in evidence against him, [*State v. Pearce*] 266 N.C. 234, 145 S.E.2d 918 [ (1966) ]. He was retried, convicted, and sentenced by the trial judge to an eight-year prison term, which, when added to the time Pearce had already spent in prison, the parties agree amounted to a longer total sentence than that originally imposed.

*Id.* at 713, 89 S.Ct. at 2074 (footnote omitted).

> In the second case, *Simpson v. Rice*,
>
> the respondent Rice pleaded guilty in an Alabama trial court to four separate charges of second-degree burglary. He was sentenced to prison terms aggregating 10 years. Two and one-half years later the judgments were set aside in a state *coram nobis* proceeding, upon the ground that Rice had not been accorded his constitutional right to counsel. See *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799. He was retried upon three of the charges, convicted, and sentenced to prison terms aggregating 25 years.

395 U.S. at 714, 89 S.Ct. at 2075 (footnotes omitted).

In its one opinion for the two cases, the United States Supreme Court decided, in relevant part, as follows:

> We hold, therefore, that neither the double jeopardy provision nor the Equal Protection Clause imposes an absolute bar to a more severe sentence upon reconviction. A trial judge is not constitutionally pre-

cluded, in other words, from imposing a new sentence, whether greater or less than the original sentence, in the light of events subsequent to the first trial that may have thrown new light upon the defendant's "life, health, habits, conduct, and mental and moral propensities." *Williams v. New York,* 337 U.S. 241, 245, 69 S.Ct. 1079, 1082, 93 L.Ed. 1337. Such information may come to the judge's attention from evidence adduced at the second trial itself, from a new presentence investigation, from the defendant's prison record, or possibly from other sources. The freedom of a sentencing judge to consider the defendant's conduct subsequent to the first conviction in imposing a new sentence is no more than consonant with the principle, fully approved in *Williams v. New York, supra,* that a State may adopt the "prevalent modern philosophy of penology that the punishment should fit the offender and not merely the crime." *Id.* at 247, 69 S.Ct. at 1083.

To say that there exists no absolute constitutional bar to the imposition of a more severe sentence upon retrial is not, however, to end the inquiry. There remains for consideration the impact of the Due Process Clause of the Fourteenth Amendment.

It can hardly be doubted that it would be a flagrant violation of the Fourteenth Amendment for a state trial court to follow an announced practice of imposing a heavier sentence upon every reconvicted defendant for the explicit purpose of punishing the defendant for his having succeeded in getting his original conviction set aside. Where, as in each of the cases before us, the original conviction has been set aside because of a constitutional error, the imposition of such a punishment, "penalizing those who choose to exercise" constitutional rights, "would be patently unconstitutional." *United States v. Jackson,* 390 U.S. 570, 581, 88 S.Ct. 1209, 1216, 20 L.Ed.2d 138. And the very threat inherent in the existence of such a punitive policy would, with respect to those still in prison, serve to "chill the exercise of basic constitutional rights." *Id.,* at 582, 88 S.Ct., at 1216. See also *Griffin v. California,*

380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106; cf. *Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718. But even if the first conviction has been set aside for nonconstitutional error, the imposition of a penalty upon the defendant for having successfully pursued a statutory right of appeal or collateral remedy would be no less a violation of due process of law. [FN19 See Van Alstyne, *In Gideon's Wake: Harsher Penalties and the "Successful" Criminal Appellant,* 74 YALE L.J. 606 (1965); Note, *Unconstitutional Conditions,* 73 HARV. L.REV. 1595 (1960).] "A new sentence, with enhanced punishment, based upon such a reason, would be a flagrant violation of the rights of the defendant." *Nichols v. United States,* 106 F. 672, 679. A court is "without right to * * * put a price on an appeal. A defendant's exercise of a right of appeal must be free and unfettered. * * * [I]t is unfair to use the great power given to the court to determine sentence to place a defendant in the dilemma of making an unfree choice." *Worcester v. Commissioner [of Internal Revenue],* 370 F.2d 713, 718. See *Short v. United States,* 120 U.S.App. D.C. 165, 167, 344 F.2d 550, 552. "This Court has never held that the States are required to establish avenues of appellate review, but it is now fundamental that, once established, these avenues must be kept free of unreasoned distinctions that can only impede open and equal access to the courts. *Griffin v. Illinois,* 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891; *Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811; *Lane.v. Brown,* 372 U.S. 477, 83 S.Ct. 768, 9 L.Ed.2d 892; *Draper v. Washington,* 372 U.S. 487, 83 S.Ct. 774, 9 L.Ed.2d 899." *Rinaldi v. Yeager,* 384 U.S. 305, 310–311, 86 S.Ct. 1497, 1500–1501, 16 L.Ed.2d 577.

Due process of law, then, requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial. And since the fear of such vindictiveness may unconstitutionally deter a defendant's exercise of the right to appeal or collaterally attack his first conviction, due process also requires

that a defendant be freed of apprehension of such a retaliatory motivation on the part of the sentencing judge. [FN20 (The existence of a retaliatory motivation would, of course, be extremely difficult to prove in any individual case. But data have been collected to show that increased sentences on reconviction are far from rare. See Note, *Constitutional Law: Increased Sentence and Denial of Credit on Retrial Sustained Under Traditional Waiver Theory,* 1965 DUKE L.J. 395 . . . . ) ]

In order to assure the absence of such a motivation, we have concluded that whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for his doing so must affirmatively appear. Those reasons must be based upon objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding. And the factual data upon which the increased sentence is based must be made part of the record, so that the constitutional legitimacy of the increased sentence may be fully reviewed on appeal.

395 U.S. at 723–26, 89 S.Ct. at 2079–81.

HRS § 706–609 was enacted in 1972. It did not follow the route permitted by the United States Supreme Court in *Pearce* and *Simpson.* It followed the American Bar Association's 1968 recommendation and specifies that "[where] a ... sentence has been set aside on direct or collateral attack, the legislature should prohibit a new sentence for the same offense ... which is more severe than the prior sentence[.]" STANDARDS RELATING TO SENTENCING ALTERNATIVES AND PROCEDURES § 3.8 (1968).

The Commentary to HRS § 706–609 states, in relevant part, as follows:

This section is derived from the American Bar Association's [1968] Standards Relating to Sentencing Alternatives and Procedures. The section is self explanatory. The reasons which compelled the American Bar Association Project to recommend this section have been well stated in the commentary to the Standards. We yield to the temptation to quote that commentary at length:

There are three reasons which have led the Advisory Committee to this view. The first relates to the selection process which leads to the possibility of an increased sentence. The only argument which can justify an increase following a re-trial is that the original sentence was too light, either because the first judge was too lenient or because new facts have been presented. However, the only class of persons who are vulnerable to this argument consists of those who have exercised the right to challenge their convictions. There is no basis for believing that there exists any rational correspondence between this group and those offenders who may indeed deserve an increase . . . .

The second argument is closely related. The risk of a greater sentence as the result of the assertion of the right of review necessarily acts as a deterrent to the exercise of the right. The issue thus posed is whether this is a desirable result. The Advisory Committee believes that it is not. The extent of the pressure placed on an individual defendant bears no relation to the degree of injustice which may have been perpetrated. A system which fears the assertion of error to a degree that it must place artificial deterrents in the path which leads to review is not a healthy system. There can also be adverse effects on the rehabilitative effort of the individual defendant who believes that he was wronged but is told that he may have to subject himself to the possibility of a greater wrong in order to assert any error.

The third reason which leads the Advisory Committee to this view begins with the difficulties which a contrary position would invite. It is a matter of record that some judges have imposed harsher sentences because of lack of sympathy with the constitutional rights asserted by some defendants, and in a frank attempt to minimize the numbers who will assert such rights in the future. Yet it is at least clear that greater punishment should not be inflicted on the

defendant because he has asserted his right to appeal. The only justification for an increased sentence, as noted above, is either that the first judge was too lenient or that new facts have been discovered. A position contrary to the standard proposed here would thus necessitate in every case a factual inquiry to determine the motivation of the judge who imposed the new sentence. As the Fourth Circuit recently pointed out, it is "impossible, and most distasteful" for other courts to be required to make that kind of inquiry. If the system can avoid such a result at a cost which is not prohibitive, it most certainly should do so. In the Advisory Committee's view, the cost in this instance particularly in light of the other reasons advanced above is not significant.

Finally, it should also be noted that there are substantial constitutional arguments which can be made against a practice contrary to the proposed standard. The First and Fourth Circuits have recently held an increased sentence after a re-trial to be unconstitutional. The Third Circuit has disagreed.

The Code finds the reasoning of the commentary to the Standards persuasive and accordingly, in this section, accepts the recommendation purposed [sic].

(Citations and footnotes omitted.)

There are the following three possible situations: (1) where the first sentence was imposed after a trial and the second sentence was imposed after a re-trial, (2) where the first sentence was imposed after an unbargained plea and the second sentence was imposed after a trial, and (3) where the first sentence was imposed pursuant to a plea bargain and the second sentence was imposed after a trial.

California does not have a statute comparable to HRS § 706–609. In *People v. Superior Court,* 131 Cal.App.3d 256, 257–59, 182 Cal.Rptr. 426, 427–28 (1982), the California Supreme Court made a distinction between situations (1) and (3). In its opinion, the California Supreme Court stated, in relevant part, as follows:

Pursuant to a plea bargain defendant entered a plea of guilty to murder in the first degree. At the voir dire prior to the entry of the plea the prosecutor made it clear that but for the bargain he would be alleging special circumstances in connection with the murder, and defendant made it equally clear that he was pleading guilty to avoid the death penalty. Shortly after the entry of plea, but prior to sentencing, defendant moved to withdraw his guilty plea. His motion was denied and he was then sentenced to life imprisonment. That judgment of conviction was reversed on appeal: the trial court was directed to allow defendant the opportunity to withdraw his guilty plea and to substitute a plea of not guilty.

After this was accomplished, the prosecutor filed an amended information adding three separate special circumstances. Defendant successfully moved to strike each....

Familiar and basic principles of law reinforced by simple justice require that when an accused withdraws his guilty plea the *status quo ante* must be restored. When a plea agreement has been rescinded the parties are placed by the law in the position each had before the contract was entered into. (*In re Sutherland* (1972) 6 Cal.3d 666, 672, 100 Cal.Rptr. 129, 493 P.2d 857.) Here defendant agreed to plead guilty to murder in order to obtain a reciprocal benefit: the forbearance of the prosecutor in not amending the information to seek the death penalty. When a defendant withdraws his plea, the prosecutor is no longer bound; counts dismissed may be restored. (*People v. Collins* (1978) 21 Cal.3d 208, 215, 145 Cal.Rptr. 686, 577 P.2d 1026.)

Defendant contends these rules change when the withdrawal of a plea is ordered by an appellate court. In particular he emphasizes one sentence in *People v. Henderson* (1963) 60 Cal.2d 482, 497, 35 Cal.Rptr. 77, 386 P.2d 677: "A defendant's right of appeal from an erroneous judgment is unreasonably impaired when he is required to risk his life to invoke that right."

Defendant, noting that he was successful on appeal from a judgment of conviction imposing imprisonment and that the prosecutor now seeks the death penalty, believes that one sentence in *Henderson* works for him. It doesn't. It has never been utilized in a situation such as this involving a plea bargain, and for good reason. *Henderson* involved double jeopardy; the case at hand does not. The language taken from *Henderson* relied upon by defendant here means only that the right of appeal from an erroneous judgment *after trial* is unreasonably impaired when a defendant is required to risk a harsher penalty to invoke that right.

(Footnotes omitted, emphasis in original.)

The United States also does not have a statute comparable to HRS § 706–609 and, in *Alabama v. Smith*, 490 U.S. 794, 798–802, 109 S.Ct. 2201, 2204–07, 104 L.Ed.2d 865 (1989), the United States Supreme Court agreed with the California Supreme Court and disagreed with its prior opinion in *Pearce* and *Simpson*. In *Smith*, the United States Supreme Court stated, in relevant part, as follows:

While sentencing discretion permits consideration of a wide range of information relevant to the assessment of punishment, see *Williams v. New York*, 337 U.S. 241, 245–249, 69 S.Ct. 1079, 1082–1084, 93 L.Ed. 1337 (1949), we have recognized it must not be exercised with the purpose of punishing a successful appeal. *Pearce*, 395 U.S., at 723–725, 89 S.Ct., at 2079–2080. "Due process of law, then, requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial." *Id.*, at 725, 89 S.Ct., at 2080. "In order to assure the absence of such a motivation, we have concluded that whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for him doing so must affirmatively appear." *Id.* at 726, 89 S.Ct., at 2081. Otherwise, a presumption arises that a greater sentence has been imposed for a vindictive purpose—a presumption that must be rebutted by " 'objective information ... justifying the increased sentence.' " *Texas v. McCullough*, 475 U.S. 134, 142, 106 S.Ct. 976, 981, 89 L.Ed.2d 104 (1986) (quoting *United States v. Goodwin*, 457 U.S. 368, 374, 102 S.Ct. 2485, 2489, 73 L.Ed.2d 74 (1982)).

While the *Pearce* opinion appeared on its face to announce a rule of sweeping dimension, our subsequent cases have made clear that its presumption of vindictiveness "do[es] not apply in every case where a convicted defendant receives a higher sentence on retrial." *Texas v. McCullough*, 475 U.S., at 138, 106 S.Ct., at 979. As we explained in *Texas v. McCullough*, "the evil the [*Pearce*] Court sought to prevent" was not the imposition of "enlarged sentences after a new trial" but "vindictiveness of a sentencing judge." *Ibid.* See also *Chaffin v. Stynchcombe*, 412 U.S. 17, 25, 93 S.Ct. 1977, 1982, 36 L.Ed.2d 714 (1973) (the *Pearce* presumption was not designed to prevent the imposition of an increased sentence on retrial "for some valid reason associated with the need for flexibility and discretion in the sentencing process," but was "premised on the apparent need to guard against *vindictiveness* in the resentencing process"). Because the *Pearce* presumption "may operate in the absence of any proof of an improper motive and thus ... block a legitimate response to criminal conduct," *United States v. Goodwin, supra*, at 373, 102 S.Ct., at 2488, we have limited its application, like that of "other 'judicially created means of effectuating the rights secured by the [Constitution],' " to circumstances "where its 'objectives are thought most efficaciously served,' " *Texas v. McCullough, supra*, at 138, 106 S.Ct., at 979, quoting *Stone v. Powell*, 428 U.S. 465, 482, 487, 96 S.Ct. 3037, 3046, 3049, 49 L.Ed.2d 1067 (1976). Such circumstances are those in which there is a "reasonable likelihood," *United States v. Goodwin, supra*, at 373, 102 S.Ct., at 2488, that the increase in sentence is the product of actual vindictiveness on the part of the sentencing authority. Where there is no such reasonable likelihood, the burden remains upon the defendant to prove actual vindictiveness, see *Wasman v. United States*, 468 U.S. 559, 569, 104 S.Ct. 3217, 82 L.Ed.2d 424 (1984).

In *Colten v. Kentucky*, 407 U.S. 104, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972), for example, we refused to apply the presumption when the increased sentence was imposed by the second court in a two-tiered system which gave a defendant convicted of a misdemeanor in an inferior court the right to trial *de novo* in a superior court. We observed that the trial *de novo* represented a "completely fresh determination of guilt or innocence" by a court that was not being "asked to do over what it thought it had already done correctly." *Id.*, at 117, 92 S.Ct. at 1960. If the *de novo* trial resulted in a greater penalty, we said that "it no more follows that such a sentence is a vindictive penalty ... than that the inferior court imposed a lenient penalty." *Ibid.* Consequently, we rejected the proposition that greater penalties on retrial were explained by vindictiveness "with sufficient frequency to warrant the imposition of a prophylactic rule." *Id.*, at 116, 92 S.Ct., at 1960. Similarly, in *Chaffin v. Stynchcombe*, 412 U.S. 17, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973), we held that no presumption of vindictiveness arose when a second jury, on retrial following a successful appeal, imposed a higher sentence than a prior jury. We thought that a second jury was unlikely to have a "personal stake" in the prior conviction or to be "sensitive to the institutional interests that might occasion higher sentences."[3] *Id.*, at 26–28, 93 S.Ct., at 1982–1983. [FN3 (We adopted a similar prophylactic rule to guard against vindictiveness by the prosecutor at the postconviction stage in *Blackledge v. Perry*, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974). There the prosecutor charged the defendant with a felony when the latter availed himself of *de novo* review of his initial conviction of a misdemeanor for the same conduct. He received a sentence of five to seven years for the felony compared to the 6–month sentence he had received for the misdemeanor. On these facts, we concluded that a presumption of vindictiveness arose analogous to that in *Pearce* because the "prosecutor clearly has a considerable stake in discouraging convicted misdemeanants from appealing." *Id.* at 27, 94 S.Ct., at

2102. We made clear, however, that "the Due Process Clause is not offended by all possibilities of increased punishment upon retrial after appeal, but only by those that pose a realistic likelihood of 'vindictiveness.'" *Ibid.* And in our other cases dealing with pretrial prosecutorial decisions to modify the charges against a defendant, we have continued to stress that "a mere opportunity for vindictiveness is insufficient to justify the imposition of a prophylactic rule." *United States v. Goodwin*, 457 U.S. 368, 384, 102 S.Ct. 2485, 2494, 73 L.Ed.2d 74 (1982); *Bordenkircher v. Hayes*, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978).) ]

We think the same reasoning leads to the conclusion that when a greater penalty is imposed after trial than was imposed after a prior guilty plea, the increase in sentence is not more likely than not attributable to the vindictiveness on the part of the sentencing judge. Even when the same judge imposes both sentences, the relevant sentencing information available to the judge after the plea will usually be considerably less than that available after a trial. A guilty plea must be both "voluntary" and "intelligent," *Boykin v. Alabama*, 395 U.S. 238, 242, 89 S.Ct. 1709, 1711, 23 L.Ed.2d 274 (1969), because it "is the defendant's admission in open court that he committed the acts charged in the indictment," *Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 1468, 25 L.Ed.2d 747 (1970). But the sort of information which satisfies this requirement will usually be far less than that brought out in a full trial on the merits.

As this case demonstrates, *supra*, at 796–797, [109 S.Ct.] at 2203–2204, in the course of the proof at trial the judge may gather a fuller appreciation of the nature and extent of the crimes charged. The defendant's conduct during trial may give the judge insights into his moral character and suitability for rehabilitation. *Supra*, at 797, [109 S.Ct.] at 2203. See *United States v. Grayson*, 438 U.S. 41, 53, 98 S.Ct. 2610, 2617, 57 L.Ed.2d 582 (1978) (sentencing authority's perception of the truthfulness of a defendant testifying on his own behalf may be considered in sentencing).

Finally, after trial, the factors that may have indicated leniency as consideration for the guilty plea are no longer present. See *Brady v. United States, supra,* at 752, 90 S.Ct., at 1471. Here, too, although the same judge who sentenced following the guilty plea also imposes sentence following trial, in conducting the trial the court is not simply "do[ing] over what it thought it had already done correctly." *Colten, supra,* at 117, 92 S.Ct., at 1960. Each of these factors distinguishes the present case, and others like it, from cases like *Pearce.* There, the sentencing judge who presides at both trials can be expected to operate in the context of roughly the same sentencing considerations after the second trial as he does after the first; any unexplained change in the sentence is therefore subject to a presumption of vindictiveness. In cases like the present one, however, we think there are enough justifications for a heavier second sentence that it cannot be said to be more likely than not that a judge who imposes one is motivated by vindictiveness.

Our conclusion here is not consistent with *Simpson v. Rice,* the companion case to *North Carolina v. Pearce.* In *Simpson v. Rice,* the complained-of sentence followed trial after Rice had successfully attacked his previous guilty plea. 395 U.S., at 714, 89 S.Ct., at 2074. We found that a presumption of vindictiveness arose when the State offered "no evidence attempting to justify the increase in Rice's original sentences...." *Id.,* at 726, 89 S.Ct., at 2081. With respect, it does not appear that the Court gave any consideration to a possible distinction between the *Pearce* case, in which differing sentences were imposed after two trials, and the *Rice* case, in which the first sentence was entered on a guilty plea.

The failure in *Simpson v. Rice* to note the distinction just described stems in part from that case's having been decided before some important developments in the constitutional law of guilty pleas. A guilty plea may justify leniency, *Brady v. United States, supra;* a prosecutor may offer a "recommendation of a lenient sentence or a reduction of charges" as part of the plea

bargaining process, *Bordenkircher v. Hayes,* 434 U.S. 357, 363,0 98 S.Ct. 663, 667, 54 L.Ed.2d 604 (1978), and we have upheld the prosecutorial practice of threatening a defendant with increased charges if he does not plead guilty, and following through on that threat if the defendant insists on his right to stand trial, *ibid.;* we have recognized that the same mutual interests that support the practice of plea bargaining to avoid trial may also be pursued directly by providing for a more lenient sentence if the defendant pleads guilty, *Corbitt v. New Jersey,* 439 U.S. 212, 221–223, 99 S.Ct. 492, 498–499, 58 L.Ed.2d 466 (1978).

Part of the reason for now reaching a conclusion different from that reached in *Simpson v. Rice,* therefore, is the later development of this constitutional law relating to guilty pleas. Part is the Court's failure in *Simpson* to note the greater amount of sentencing information that a trial generally affords as compared to a guilty plea. Believing, as we do, that there is no basis for a presumption of vindictiveness where a second sentence imposed after a trial is heavier than a first sentence imposed after a guilty plea, we overrule *Simpson v. Rice, supra,* to that extent.

Writing in dissent from the Court's decision in *Smith,* Justice Marshall stated, in relevant part, as follows:

After successfully challenging the validity of his plea bargain on the ground that the trial judge had misinformed him about the penalties he could face, respondent Smith went to trial. He was convicted and resentenced to a drastically longer sentence than the one he had initially received as a result of his plea bargain. The majority today finds no infirmity in this result. I, however, continue to believe that, "if for any reason a new trial is granted and there is a conviction a second time, the second penalty imposed cannot exceed the first penalty, if respect is had for the guarantee against double jeopardy." *North Carolina v. Pearce,* 395 U.S. 711, 726–727, 89 S.Ct. 2072, 2089, 23 L.Ed.2d 656 (1969) (Douglas,

J., concurring, joined by Marshall, J.) (emphasis added). I therefore dissent.

*Smith*, 490 U.S. at 803–04, 109 S.Ct. at 2207.

Utah has a statute comparable to HRS § 706–609. In *State v. Powell*, 957 P.2d 595 (1998), the Supreme Court of Utah decided, in relevant part, as follows:

Powell was charged with second degree murder after running over and killing another man at a party following an extended confrontation between the two. He entered into a plea bargain with the prosecution whereby he was allowed to plead guilty to the reduced charge of manslaughter. He was then sentenced to one to fifteen years in the state prison.

Thereafter, Powell moved to set aside his plea bargain on the basis that the trial judge had failed to properly advise him of the consequences of entering a guilty plea to manslaughter. The trial court denied the motion. He appealed from the denial to the court of appeals which reversed the trial court and held in a memorandum decision that Powell should have been allowed to withdraw his plea. *State v. Powell*, No. 900202 (Utah Ct.App. Oct. 24, 1990) (mem.).

On remand to the trial court, Powell withdrew his plea. Following a subsequent jury trial, he was convicted of the original charge of second degree murder and was sentenced to five years to life. This court affirmed his conviction and sentence. *State v. Powell*, 872 P.2d 1027 (Utah 1994). He did not raise any issue at trial or on appeal regarding the applicability of section 76–3–405 to his case.

Powell subsequently filed a motion to correct his sentence in the trial court, arguing that the imposition of the sentence for murder violated Utah Code Ann. § 76–3–405 (1995) [FN1 (Section 76–3–405 was amended in 1997 making it inapplicable to cases where a defendant enters into a plea agreement and then later successfully moves to withdraw his plea. However, because Powell's second sentence was imposed before the 1997 amendment, we must rely on the pre-amended version of the statute to decide this case. Therefore, all further references to section 76–3–405 are to the 1995 version unless stated otherwise.) ] because it was more severe than the sentence he had received following his guilty plea to manslaughter. Section 76–3–405 provides:

Where a conviction or sentence has been set aside on direct review or on collateral attack, the court shall not impose a new sentence for the same offense or for a different offense based on the same conduct which is more severe than the prior sentence less the portion of the prior sentence previously satisfied.

The motion was denied, and Powell appeals. He contends that his case falls within the plain language of section 76–3–405 because the court of appeals set aside his conviction and sentence when it reversed the trial court's order denying his motion to withdraw his plea. Therefore, he argues, the more severe sentence imposed following his conviction for second degree murder violates section 76–3–405 and must be corrected. The State responds that this section was not intended to limit a second sentence imposed following the withdrawal of a plea bargain.

. . . .

Powell contends that the plain language of section 76–3–405 prohibited the trial court from imposing the more severe sentence he received following his trial for second degree murder. He argues that following his guilty plea, a conviction and sentence for manslaughter were entered and that both were subsequently set aside on appeal by the court of appeals.

While we agree that the language of section 76–3–405 is plain, the fundamental question before us is whether Powell's conviction was "set aside on direct review or collateral attack." We hold that it was not. As the trial court concluded, Powell's "appeal was not an attack on his conviction or sentence, but on the denial of his Motion to Withdraw Guilty Plea. Hence, defendant's 'conviction or sentence' has not 'been set aside on direct review or collateral attack'" as required by section 76–3–405.

When an order denying a motion to withdraw a plea is reversed on appeal, the

appellate court does not "set aside" the conviction. Rather, the appellate court merely overturns the trial court's order and then remands the case to allow the defendant to withdraw his plea if he still desires to do so. In this case, the court of appeals order stated that the "[d]enial of defendant's motion to set aside his guilty plea is reversed. The case is remanded to allow defendant to withdraw his guilty plea, and, if appropriate, proceed to trial." Powell withdrew his plea following the remand, in effect setting aside his own conviction. Thus, although he prevailed on appeal, his conviction was not set aside at that point. It was not until he withdrew his plea before the trial court that his conviction and sentence were set aside and a new trial ordered. Therefore, Powell's conviction and sentence were not set aside by the court of appeals' reversal of the trial court's order denying his motion to withdraw his plea.

Moreover, our holding does not conflict with the purposes of section 76–3–405. In *State v. Babbel*, 813 P.2d 86 (Utah 1991), we stated that "[t]he purpose behind th[is] provision ... [section 76–3–405] is to prevent the chilling effect on the constitutional right to appeal which the possibility of a harsher sentence would have on a defendant who might be able to demonstrate reversible error in his conviction." *Id.* at 88. In that case, we held that section 76–3–405 does not apply to a correction of an illegal sentence because "[t]he correction of an illegal sentence stands on a different footing than the correction of an error in a conviction." *Id.* This is so, in part, because "a defendant is not likely to appeal a sentence that is unlawfully lenient, and there is, therefore, minimal chilling effect on the right to appeal." *Id.*

Like the correction of an illegal sentence, the reversal of the denial of a motion to withdraw also stands on different footing than the correction of an error in conviction. Powell himself admits, as he must, that if the trial court had granted his motion to withdraw his plea, the State would have been free to again pursue the second degree murder charge and section 76–3–405 would not apply. See *Martinez*

*v. Smith*, 602 P.2d 700, 702 (Utah 1979) (stating that if defendant "be permitted to withdraw his plea, fairness requires that the case should revert to its status on the original charge"). Therefore, it is difficult to see how the reinstatement of the original charge after the reversal of a denial of a motion to withdraw could have a chilling effect on Powell's right to appeal. By choosing to withdraw his plea, he rescinded the plea agreement with the prosecution and accepted the likelihood that the prosecution would pursue the second degree murder charge with its more severe penalties. In other words, the more severe sentence sought by the State and imposed after Powell's conviction of second degree murder was the product of his repudiation of the plea agreement, not the result of his appeal.

We also believe that it would be unwise to hold that a sentence imposed pursuant to a plea agreement should limit a sentence subsequently imposed at trial after defendant has withdrawn his plea. Plea bargains are entered into so that both sides may avoid the expense and uncertainty of a trial. In exchange for conserving State resources, defendant usually receives a lower charge or lesser sentence. Thus, it would be anomalous to allow a defendant to keep the benefit of an agreement he repudiated while requiring the State to proceed to trial and prove its case.

Writing in dissent from the court's decision in *Powell*, Associate Chief Justice Durham stated, in relevant part, as follows:

While I believe that this case is readily distinguishable from its companion case *State v. Maguire*, [957 P.2d 598 (1998),] I dissent here for the same reason that I did in *Maguire*. I would hold that the court of appeals, when it granted defendant Powell's Motion to Withdraw Plea, did set aside "on direct review" a conviction or sentence as contemplated by section 76–3–405 of the Utah Code. The majority holds that Powell's conviction to a harsher sentence after his withdrawal of a plea bargain and a subsequent trial did not violate section 76–3–405 of the Utah Code. I would

hold that the harsher sentencing violated section 76-3-405.

As in *State v. Maguire,* the majority resorts to unlikely semantic distinctions to avoid the plain language of the statute. The majority thereby amends the statute to accomplish the same end that the legislature has since accomplished by amending section 76-3-405 to preclude plea bargains. Utah Code Ann. § 76-3-405(2)(b) (Supp. 1997). We should not ignore plain language in order to rectify a presumed mistake by the original drafting legislators.

More recently, in *State v. Wagner,* 356 N.C. 599, 600-02, 572 S.E.2d 777, 778-79 (2002), the Supreme Court of North Carolina decided, in relevant part, as follows:

Defendant Belvin Eugene Wagner was originally arrested without a warrant when he attempted to purchase cocaine during an undercover drug operation on 17 July 1998 in which undercover law enforcement officers used blanched macadamia nuts as fake crack cocaine. On 17 August 1998, based on an information, defendant entered a negotiated guilty plea to the offense of attempted possession of cocaine as an habitual felon. This plea bargain provided that defendant would receive a minimum sentence of 101 months' imprisonment based on his criminal history, which was calculated to be at level VI. The trial court entered judgment sentencing defendant to serve 101 to 131 months' confinement.

Defendant thereafter filed a motion for appropriate relief asserting that his record level had been improperly calculated as a level VI when in fact his criminal history resulted in a level V for sentencing purposes. Concluding that defendant's plea bargain and guilty plea were based on "the mutual mistake of all parties as to [defendant's] proper record level for sentencing purposes," the trial court on 10 May 2000, *nunc pro tunc* 2 May 2000, vacated and set aside defendant's guilty plea and the judgment entered thereon.

. . . .

On 17 October 2000 a jury found defendant guilty of attempt to possess cocaine, felonious possession of drug paraphernalia, and being an habitual felon. The trial court sentenced defendant at level VI to serve two consecutive 135- to 171-month sentences.

Before this Court defendant asserts that the Court of Appeals erred in upholding these convictions and sentences. Defendant . . . contends . . . that the subsequent sentence for attempted possession of cocaine . . . violated N.C.G.S. § 15A-1335. . . .

. . . .

Defendant was . . . improperly sentenced for his conviction for attempt to possess cocaine. N.C.G.S. § 15A-1335 provides:

When a conviction or sentence imposed in superior court has been set aside on direct review or collateral attack, the court may not impose a new sentence for the same offense, or for a different offense based on the same conduct, which is more severe than the prior sentence less the portion of the prior sentence previously served.

N.C.G.S. § 15A-1335 (2001). Pursuant to this statute a defendant whose sentence has been successfully challenged cannot receive a more severe sentence for the same offense or conduct on remand.

In this case, contrary to the State's contention, the fact that defendant's original conviction resulted from a negotiated plea bargain rather than a finding of guilty by a jury is of no consequence. This Court has held that "[a] plea of guilty, accepted and entered by the trial court, is the equivalent of conviction." *State v. Brown,* 320 N.C. 179, 210, 358 S.E.2d 1, 22, *cert. denied,* 484 U.S. 970, 108 S.Ct. 467, 98 L.Ed.2d 406 (1987). After defendant's plea and sentence were set aside pursuant to his motion for appropriate relief, a sentence of 135 to 175 months' imprisonment for defendant's conviction at trial for attempt to possess cocaine was contrary to the mandate of section 15A-1335 when defendant's original sentence was only 101 to 131 months' imprisonment for the same offense. See *State v. Hemby,* 333 N.C. 331, 336-37, 426 S.E.2d 77, 80 (1993).

In Mara's case, the following events occurred in the following sequence: (a) unbargained guilty pleas to the three counts charged in the indictment, (b) a presentence report and a victim impact statement, (c) a granting of a motion for repeat offender sentencing, (d) a denial of a motion for extended term and consecutive sentencing, (e) a first sentence and judgment of conviction, (f) a post-conviction proceeding initiated by Mara, (g) a vacating of the first sentence and judgment of conviction, (h) a court-approved withdrawal of the guilty pleas, (i) pleas of not guilty, (j) a trial, and (k) a second sentence and judgment of conviction.

■ Mara's case presents us with situation (2). We conclude that HRS § 706–609 applies to situations (1) and (2). Mara's case does not present us with situation (3) or the question of whether HRS § 706–609 applies to situation (3) and we do not answer that question.

■ The next question is whether Mara's first "conviction or sentence [was] set aside on direct or collateral attack[.]" As noted above, in *Powell, supra,* the Utah Supreme Court decided, in relevant part, that

[as] the trial court concluded, Powell's "appeal was not an attack on his conviction or sentence, but on the denial of his Motion to Withdraw Guilty Plea. Hence, defendant's 'conviction or sentence' has not 'been set aside on direct review or collateral attack'" as required by section 76-3-405. When an order denying a motion to withdraw a plea is reversed on appeal, the appellate court does not "set aside" the conviction. Rather, the appellate court merely overturns the trial court's order and then remands the case to allow the defendant to withdraw his plea if he still desires to do so. In this case, the court of

appeals order stated that the "[d]enial of defendant's motion to set aside his guilty plea is reversed. The case is remanded to allow defendant to withdraw his guilty plea, and, if appropriate, proceed to trial." Powell withdrew his plea following the remand, in effect setting aside his own conviction. Thus, although he prevailed on appeal, his conviction was not set aside at that point. It was not until he withdrew his plea before the trial court that his conviction and sentence were set aside and a new trial ordered. Therefore, Powell's conviction and sentence were not set aside by the court of appeals' reversal of the trial court's order denying his motion to withdraw his plea.

In other words, although Powell's conviction and sentence were "set aside[,]" the court concluded that his "attack" was directed at his guilty plea rather than at the conviction or the sentence. In Hawai'i, a judgment is an adjudication of guilt and a sentence. HRPP Rule 32(c) (Supp.2003). The reduction of a sentence or a correction of an illegal sentence or a sentence imposed in an illegal manner is permitted by HRPP Rule 35 (2003).[7]

The relevant part of Mara's March 1, 2001 Motion for Correction of Sentence Under *HRPP* Rule 35, or in the Alternative, Motion to Withdraw Guilty Plea is the "Motion to Withdraw Guilty Plea[.]" When Mara made this motion, the November 29, 2000 Judgment was final, had not been appealed, and was unappealable because the time for appeal had expired. No Hawai'i court could grant Mara's request to withdraw his guilty plea without setting aside the November 29, 2000 Judgment (and its adjudication of guilt and sentence) pursuant to HRPP Rule 40(a)(1) (2003)[8] and HRPP Rule 32(d)

7. Hawai'i Rules of Penal Procedure (HRPP) Rules 35 and 40(a)(3) were amended effective July 1, 2003.

8. HRPP Rule 40 (2003) states, in relevant part, as follows:

(a) *Proceedings and grounds.* The post-conviction proceeding established by this rule shall encompass all common law and statutory procedures for the same purpose, including habeas corpus and coram nobis; provided that

the foregoing shall not be construed to limit the availability of remedies in the trial court or on direct appeal. Said proceeding shall be applicable to judgments of conviction and to custody based on judgments of conviction, as follows:

(1) From judgment 'At any time but not prior to final judgment, any person may seek relief under the procedure set forth in this rule from the judgment of conviction, on the following grounds:

(2003) [9]. Mara's "Motion to Withdraw Guilty Plea" was a post-judgment motion implicitly made pursuant to HRPP Rules 40(a)(1) and 32(d) [10] and attacking the November 29, 2000 Judgment (and its adjudication of guilt and sentence) and his guilty pleas on the ground that Mara "was not advised by the Court of the consequences of repeat offender sentencing at the time he entered his guilty pleas[.]" It was a collateral attack on the November 29, 2000 Judgment because it was in a proceeding separate from the original action (Cr. No. 98–2052). *See* 47 Am.Jur. 2d *Judgments* § 905 (1995) ("[Where] a judgment is attacked in a way other than a proceeding in the original action ..., such an attack is considered a collateral attack."). This collateral attack having resulted in the vacating of the November 29, 2000 Judgment (and its adjudication of guilt and sentence), HRS § 706–609 precluded a subsequent sentence harsher than the sentence imposed by the November 29, 2000 Judgment.

4.

In his opening brief, Mara admits that, pursuant to HRS § 706–606.5, his three prior felony convictions subjected him to a mandatory minimum term of imprisonment equivalent to the ordinary maximum term for each offense, but notes that "[the] court may impose a lesser mandatory minimum period of imprisonment without possibility of parole than that mandated by [HRS § 706–606.5] where the court finds that strong mitigating

> (i) that the judgment was obtained or sentence imposed in violation of the constitution of the United States or of the State of Hawai'i;
> (ii) that the court which rendered the judgment was without jurisdiction over the person or the subject matter;
> (iii) that the sentence is illegal;
> (iv) that there is newly discovered evidence; or
> (v) any ground which is a basis for collateral attack on the judgment.
>
> For the purposes of this rule, a judgment is final when the time for direct appeal under Rule 4(b) of the Hawai'i Rules of Appellate Procedure has expired without appeal being taken, or if direct appeal was taken, when the appellate process has terminated, provided that a petition under this rule seeking relief from judgment may be filed during the pendency of direct appeal if leave is granted by order of the appellate court.

circumstances warrant such action." HRS § 706–606.5(5). Mara contends that the circuit court erred when it "either [rejected] or [failed] to consider 'strong mitigating circumstances' which would reduce [Mara's] mandatory term of imprisonment as set forth in" HRS § 706–606.5. Mara cites his family problems, physical and mental problems, learning disability, educational problems, history of dependence on crystal methamphetamine and cannabis, and treatment at the Salvation Army facility and at Victory Ohana as strong mitigating factors that reduce the mandatory minimums prescribed by statute. Mara also alleges the existence of a public policy favoring the opportunity for parole.

There is no evidence supporting Mara's allegation that the court "[failed] to consider 'strong mitigating circumstances' which would reduce [Mara's] mandatory term of imprisonment[.]" The relevant standard of review is the abuse of discretion standard. We conclude that the court did not abuse its sentencing discretion when it declined to reduce Mara's mandatory term of imprisonment.

Mara additionally contends that "the court was cognizant of [Mara's] desire for a reduced mandatory minimum. No finding was made either way, and [Mara] was sentenced to the full statutory minimum. At a minimum, the issue should be remanded for clarification." We disagree. HRS § 706–606.5(5) requires the court to "provide a written opin-

9. HRPP Rule 32(d) (2003) states as follows:

> *Withdrawal of plea of guilty.* A motion to withdraw a plea of guilty or of nolo contendere may be made only before sentence is imposed or imposition of sentence is suspended; but to correct manifest injustice the court after sentence shall set aside the judgment of conviction and permit the defendant to withdraw his plea.

10. In *State v. Nguyen*, 81 Hawai'i 279, 916 P.2d 689 (1996), Nguyen entered a plea of "no contest" on November 14, 1985. He was sentenced on January 17, 1986. The Judgment was entered on January 20, 1986. On September 10, 1993, Nguyen filed a motion in the circuit court to withdraw his earlier "no contest" plea. In its opinion, the Hawai'i Supreme Court discussed HRPP Rule 32(d) but did not mention HRPP Rule 40(a)(1). It also indicated that the question of the existence of "manifest injustice" is a finding of fact. *Id.* at 292, 916 P.2d at 702.

ion stating its reasons" only when it "finds
that strong mitigating circumstances war-
rant" "a lesser mandatory minimum period of
imprisonment without possibility of parole"
than mandated by HRS § 706–606.5(1) and
imposes a lesser sentence.

CONCLUSION

Accordingly, we affirm the "Guilty Convic-
tion" part of the November 14, 2001 Judg-
ment, Guilty Conviction and Sentence en-
tered against Mara. We vacate and remand
the "Sentence" part of the November 14,
2001 Judgment, Guilty Conviction and Sen-
tence for further proceedings not inconsis-
tent with this opinion.